NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| NEELU PAL, :<br>:<br>Plaintiff, :<br>:<br>v. :<br>:<br>JERSEY CITY MEDICAL CENTER, et :<br>al., :<br>:<br>Defendants. :<br>: | **Civil Action No. 11-6911 (SRC)**<br><br>**OPINION** |

**CHESLER**, District Judge

      This matter comes before the Court on the renewed motion for summary judgment filed by Defendants Jersey City Medical Center ("JCMC"), the Medical-Dental Staff of JCMC and Nathaniel Holmes, M.D. (collectively, the "JCMC Defendants").  Pro se Plaintiff Neelu Pal, M.D. ("Plaintiff" or "Dr. Pal") opposes the motion. The Court has considered the papers filed by the parties and proceeds to rule without oral argument, pursuant to Federal Rule of Civil Procedure 78.  For the reasons that follow, the Court will grant the JCMC Defendants' motion for summary judgment.

### I.  BACKGROUND

      As previous Opinions have set forth, this action arises out of the denial of Dr. Pal's application for surgical privileges at JCMC.  Dr. Pal, who is a female of Indian origin, claims that the denial was motivated by discrimination against her on the basis of gender and national origin.  By Opinion and Order of July 21, 2014, the Court granted the motion for summary

judgment brought by the Defendants affiliated with the University of Medicine and Dentistry of New Jersey ("UMDNJ"), who were involved in this action for their role in giving negative recommendations about Dr. Pal in JCMC's credentialing process.  (The Court will refer to the other group of defendants as the "UMDNJ Defendants.")  Dr. Pal had claimed the UMDNJ Defendants, physicians with whom she had worked prior to applying for privileges at JCMC, acted in a discriminatory manner and conspired with JCMC to deprive her of her surgical career. The Court found that Dr. Pal was collaterally estopped from pursuing her claims against the UMDNJ Defendants, including a conspiracy claim pursuant to 42 U.S.C. § 1985, because she had previously tried a case to verdict on the same issue before a jury in New Jersey Superior Court. (As it did in the July 21, 2014 Opinion, the Court will refer to that case as the "State Action.")  Three claims, as to the JCMC Defendants, remain in this case: a claim under 42 U.S.C. § 1985, a breach of contract claim and a defamation claim. The following synopsis focuses on the facts relating to Dr. Pal's dispute with JCMC Defendants.

### A.  Dr. Pal's Application for Privileges at JCMC

In or about March 2009, Dr. Pal, a board-certified surgeon, applied for membership to the medical-dental staff of JCMC.  As requested, she identified professional references in support of her application; these were Dr. Dorian Wilson, Dr. George Macheido and Dr. Edwin Deitch. Defendant Dr. Holmes, the chairman of JCMC's Credentials Committee, reviewed the application and began collecting information from the references she identified. The record shows that these physicians were sent a form provided by JCMC, which contained various pre-printed questions and set forth six areas of evaluation of general competence to be rated according to four categories: excellent, good, fair or poor. In the questionnaire he signed on March 20, 2009, Dr. Wilson, the program director for the general surgery residency program at

UMDNJ-Newark, ranked all competence areas as "good" and checked the box corresponding to

"recommended highly and without reservation." (Def. Ex. 2 at 59-60.)  Dr. Deitch, the chairman

of UMDNJ's department of surgery, submitted a questionnaire, also dated March 20, 2009, with

the same ranking and recommendation. (Id. at 47-48.) Dr. Pal's third reference, Dr. Macheido,

declined to comment.  He responded to the request for information through his secretary, and the

communication was noted in a memo from the coordinator of JCMC's Medical-Dental Staff

Office to the Credentials Committee. The memo stated, in part, as follows:

> On the above date [March 31, 2009], I received a call from Dr.
> Macheido's secretary at the VA New Jersey Healthcare System.  She
> stated that since Dr. Pal had only rotated through the VA while serving her
> General Surgery residency at UMDNJ, Dr. Macheido does not feel he can
> provide a satisfactory evaluation of her clinical competence.

(Id. at 40.)  The coordinator then emailed Dr. Pal on April 8, 2009 and informed her that "Dr.

Macheido does not feel he can provide an accurate evaluation" because Dr. Pal had only done "a

rotation through the VA while serving [her] residency at UMDNJ."  (Id. at 39.)  In that email, the

coordinator also asked Dr. Pal to provide an alternate reference to replace Dr. Macheido.  It does

not appear from the record that another reference was provided.

By means of the same questionnaire, information was also collected from practitioners

who had worked with Dr. Pal in the various residency and fellowship programs she identified in

her application.  Dr. Peter Scholz, program director of cardiothoracic surgery training at

UMDNJ's Robert Wood Johnson Hospital (hereinafter "UMDNJ-RWJ"), ranked her

interpersonal and communication skills and patient care skills as "fair" and checked the box for

"recommended with some reservation." (Id. at 49-50.)  Dr. Robert Brolin, program director of

bariatric surgery at University Medical Center-Princeton, ranked Dr. Pal "good" in only two

areas of general competence: medical knowledge and system-based practice.  The other four

areas, namely patient care, practice-based learning & improvement, interpersonal & communication skills and professionalism were rated as "fair." He noted that he could not comment on her ability to perform medical procedures during the training program because he generally did not observe her in performing them. Dr. Brolin responded "no" to the question about whether Dr. Pal had been subject to any sanctions but wrote in the comment "not at our medical center." He further responded that he was not willing to be contacted for further information about Dr. Pal, adding the handwritten comment "do your homework." Dr. Brolin checked the box for "recommended with some reservation," adding the handwritten comment "personality." (Id. at 53-54.) Dr. Christine Ren, director of the bariatric surgery fellowship program at New York University Medical Center ("NYU"), telephonically informed the JCMC credentials office that she did not feel comfortable filling out the form but would speak to the department chair.

Dr. Pal's experience at NYU warrants further exposition. She disclosed on her JCMC staff membership application that she had been dismissed from the fellowship program in February 2006. In an addendum to the application, Dr. Pal explained that during her training at NYU, which she reported as having commenced on October 3, 2005, she brought serious issues "regarding the deficient quality of patient care," to the attention of the program director. (Id. at 79.) Specifically, she stated that "there was a possibly preventable patient death as well as a serious adverse event with another patient." (Id.) Because, according to Dr. Pal, these issues were not addressed, she "contacted and suggested to a few patients that they discuss the procedure and the circumstances of their safety in detail with the surgeons and hospital administration prior to surgery." (Id.) When the program director, Dr. Ren, found out, Dr. Pal continued, she became "enraged." (Id.) Dr. Pal concluded the addendum by stating that she had

4

retained legal counsel to deal with what she believed was an unjustified action by NYU in dismissing her and was "confident that [she] will prevail at legal proceedings against NYU." (Id.)

Thereafter, on June 4, 2009, Dr. Holmes met with Dr. Pal as part of the credentialing process.  They give differing accounts of their meeting.  Dr. Holmes states that he informed Dr. Pal that he found her references "potentially problematic" and advised her to look into other things or get other references.[1]   He further contends that she became confrontational and threatened that he cannot deny her privileges.  In Dr. Pal's version, she denies that she was ever told that her references were "potentially problematic" or that she was provided by Dr. Holmes with the opportunity to supplement her application with alternate letters.  She also maintains that, at this meeting, she informed Dr. Holmes "of complaints of race and gender discrimination and retaliation [she] had made against UMDNJ-RWJMS and its employees (namely Peter Scholz, MD and George Batsides, MD)."  (8/19/14 Pal Aff., ¶ 1.)  According to Dr. Pal, Dr. Holmes demanded that she withdraw her application and she refused.

Dr. Holmes proceeded with the investigation of Dr. Pal's experience and qualifications for membership to the JCMC medical staff.  Dr. Holmes felt he needed more information given the "unusual" nature of her application insofar as the references were concerned.  In the Fair Hearing, he explained his concern as follows:

> The application was quite unusual insofar as the --- one of the first things I
> check is the letters of reference.  99 percent of the time, you know, if they
> say, you know, this is a great person, best thing since sliced bread, etc. and
> so forth, and everything else is kind of technical, then I review, you know,
> malpractice files as well as, you know, some other, you know, minor
> items. Her application was quite unusual in the fact that while occasionally

---

[1] Dr. Holmes expressed his assessment of Dr. Pal's application in testimony given during the internal JCMC hearing held in connection with Dr. Pal's intra-hospital appeal of the denial of her application.  The record refers to this hearing as the "Fair Hearing."  The Fair Hearing transcript, cited in support of the JCMC Defendants' motion, is the source of evidence recited in this Opinion's synopsis as it relates to Dr. Holmes's version of events.

you'll see somebody who has one reference that is maybe a little
questionable, all of her references were questionable, which I've never
seen before.

(5/4/10 Tr. at 34:6-19.)

To gather more information about Dr. Pal's clinical competence, training, ethics and
behavior, Dr. Holmes had telephone conversations with various doctors who had been asked to
submit questionnaires evaluating Dr. Pal.  He spoke with Dr. Ren about the circumstances
related to Dr. Pal's termination from NYU.  Dr. Ren told him that Dr. Pal, who as a fellow in the
program had no patients of her own, was making anonymous phone calls at night to the attending
surgeons' patients and their families, warning them that it would be dangerous to go forward
with their surgeries at NYU.  Dr. Ren said that Dr. Pal was confronted about this conduct and
admitted that she had made the phone calls.  Dr. Ren confirmed to Dr. Holmes that this behavior
resulted in Dr. Pal's termination. Dr. Holmes contacted Dr. Scholz, who supervised Dr. Pal in the
cardiothoracic surgery program at UMDNJ-RWJ, where she had made complaints of
discrimination.  According to Dr. Holmes, Dr. Scholz acknowledged that Dr. Pal had complained
about discriminatory comments made about her but informed him that these allegations were
found to be unsubstantiated following an investigation.  Dr. Scholz told Dr. Holmes that when
Dr. Pal refused to retract her complaint, she was asked to resign from the residency program.  Dr.
Holmes also telephoned Dr. Wilson, who had supervised Dr. Pal in the general surgery residency
she completed at UMDNJ-Newark. Dr. Wilson's questionnaire was favorable to Dr. Pal, but
during the call, Dr. Wilson informed Dr. Holmes that he had since reviewed Dr. Pal's file and
could no longer endorse her application based on his current knowledge.  Dr. Holmes did not
contact Dr. Deitch, also of UMDNJ-Newark, because, he explained, "typically, when you want
information about a resident you go to the Program Director" and that was Dr. Wilson.  (5/4/10

Tr. 112:22-23.)  He contacted Dr. Brolin, Dr. Pal's supervisor in the residency she completed most recently to the time of her application, but as in his questionnaire, Dr. Brolin refused to discuss Dr. Pal or provide any information about her.

After these conversations, Dr. Holmes and Dr. Pal met a second time, on August 6, 2009. Again, Dr. Pal's version of what transpired during the meeting differs from the account given by Dr. Holmes when he testified at the Fair Hearing.  According to Dr. Holmes, he advised Dr. Pal that based on her references and on the information he gathered, her application continued to lack proper support and was likely to be denied by the Credentials Committee.  Thus, he states, he presented Dr. Pal with the option of having him present her application to the Credentials Committee or withdrawing the application.  Dr. Pal denies that she was advised that her references were not supportive.  Rather, according to Dr. Pal, Dr. Holmes expressed his opinion that she should not have made complaints about discrimination while at UMDNJ-RWJ and that as a result of her complaints, her application for privileges would be denied.

It is, nevertheless, undisputed that Dr. Pal pressed forward with the application.  In presenting the application to the Credentials Committee at its September 1, 2009 meeting, Dr. Holmes recommended against her appointment to the JCMC medical staff due to her deficient references.  Thereafter, the Medical Executive Committee recommended that the hospital's Board of Trustees deny Dr. Pal's application, noting that her credentials were reviewed and discussed by the Credentials Committee, which expressed general consensus to follow Dr. Holmes's recommendation.  In reaching this conclusion, the Medical Executive Committee specifically noted that "Dr. Pal received substandard professional references which were discussed with her during a personal interview."  (Def. Ex. 4.)

By letter of November 25, 2009, JCMC informed Dr. Pal that her application for staff appointment was denied.  The letter further advised that she had the right to appeal the decision and gave instructions on how to do so.  Dr. Pal promptly filed her appeal, and on December 14, 2009, JCMC notified her that a hearing would be scheduled.  The letter stated that upon her request, JCMC would provide her with "copies of all materials which the MEC [Medical Executive Committee] will rely upon at the hearing" and further advised her that, according to JCMC's bylaws, she was entitled to legal representation at the hearing.  (Def. Ex. 8)  A hearing took place over two days, during which Dr. Pal was represented by counsel.  The Fair Hearing Committee heard testimony from two witnesses, Dr. Holmes and Dr. Pal.  In a report and recommendation issued on February 10, 2011, the Fair Hearing Committee found that "the numerous unfavorable or less than favorable references Dr. Pal offered, provide more than sufficient evidence to support the adverse action taken in denying Dr. Pal's application."  (Def. Ex. 11 at 848.)  The Fair Hearing Committee expressly rejected Dr. Pal's position that she was qualified to be granted privileges, stating that "she failed to demonstrate her qualifications on the basis of her substandard and unacceptable references." [2]  (Id.)  It found that the adverse action was reasonable based on the information presented.  The Medical Executive Committee adopted this report and recommendation and affirmed the decision to deny Dr. Pal's application.

Again, Dr. Pal was informed of this disposition and appealed through the final level of intra-hospital review. The Appellate Review Committee affirmed the prior decision.  Upon that recommendation, the Board of Trustees made its final determination to deny Dr. Pal membership

---

[2] While the report prepared by the Fair Hearing Committee based its recommendation on Dr. Pal's deficient references, it remarked on Dr. Pal's conduct during the application process.  Crediting Dr. Holmes's testimony, the report noted that "Dr. Pal's alleged aggressive and threatening behavior during her interview with Dr. Holmes is not only inappropriate it was not [sic] deeply troubling.  These allegations alone would have given the Credentials Committee sufficient reason to reject her application for Staff membership." (Def. Ex. 11 at 848.)

on the JCMC medical staff and hospital privileges.  By letter of August 18, 2011, Dr. Pal was

advised of this determination.  On October 4, 2011, JCMC filed an Adverse Action Report with

the National Practitioner Data Bank, regarding the denial of her application for membership and

privileges.

### B.  Procedural History of this Action

Shortly after she exhausted her intra-hospital appeal of JCMC's decision, Dr. Pal initiated

this action on November 23, 2011.[3]  She was at that time simultaneously litigating the State

Action, in which she pursued relief against UMDNJ for two alleged acts of retaliation for

complaining about gender and national origin discrimination: (1) the non-renewal of her contract

in UMDNJ-RWJ's cardiothoracic surgery program and (2) the negative recommendations given

by UMDNJ physicians to Dr. Holmes. Dr. Pal was also pursuing whistleblowing claims against

NYU in the Southern District of New York relating to the termination of her employment.

The State Action, which this Court discussed in great detail in its July 21, 2014 Opinion

granting summary judgment in favor of the UMDNJ Defendants, was tried to verdict before a

jury, which awarded Dr. Pal $1.6 million in damages on her claim relating to the non-renewal of

the residency.  The jury, however, found that the negative recommendations were not retaliatory.

After entry of judgment in the State Action in April 2013, all Defendants in this action moved for

summary judgment based on issue preclusion and the entire controversy doctrine, but the Court

denied the initial summary judgment motions for lack of a sufficient record to demonstrate that

---

[3] Though she now appears pro se, Dr. Pal has been represented by legal counsel throughout a significant portion of
this litigation.  She filed the Complaint through counsel but, four months later, discharged her first attorney, Ty
Hyderally. Mr. Hyderally moved to withdraw on the basis of "irreconcilable" differences with Dr. Pal as to "the
responsibilities of litigation" and "core legal strategy."  [docket entry 26-1 at 2.]  After Mr. Hyderally was relieved
as counsel for Plaintiff, Dr. Pal secured new counsel, Jacob Hafter. He, too, moved to withdraw on the basis that Dr.
Pal refused to communicate with him, refused to cooperate with discovery and terminated the attorney-client
relationship in writing.  Mr. Hafter was relieved as counsel on June 17, 2013.

either preclusive doctrine applied.  The UMDNJ Defendants renewed their motion, presenting additional relevant portions of the State Action record, and the Court granted summary judgment in their favor by Order of July 21, 2014.[4]

### C.  JCMC Defendants' Summary Judgment Motion

The JCMC Defendants filed their renewed motion for summary judgment on July 25, 2014.  In the motion before the Court, they raise three arguments.  First, they maintain that the doctrine of collateral estoppel applies by virtue of the JCMC intra-hospital credentialing and appeals process, barring Dr. Pal from bringing claims which essentially challenge the reasonableness of the hospital's decision.  Second, and alternatively, they argue that the breach of contract and defamation claims are barred by the immunity granted by the Health Care Quality Improvement Act ("HCQIA"). Third, the JCMC Defendants argue that Dr. Pal has failed to proffer sufficient evidence to raise a genuine issue of fact as to any of her three claims against the JCMC Defendants.  The Court will address each of these arguments in turn.

---

[4] The July 21, 2014 Opinion and Order also denied Dr. Pal's cross-motion to amend the Complaint and denied the UMDNJ Defendants' motion for Rule 11 sanctions against Dr. Pal.  As to Dr. Pal's motion, the Court noted that the motion was dilatory and prejudicial, as Dr. Pal had sought to expand the litigation long after the close of discovery and the court-ordered deadline, without explaining why the additional legal theories and factual allegations were not previously pled.  In addition to moving for summary judgment, the UMDNJ Defendants sought Rule 11 sanctions, arguing that Dr. Pal had made misrepresentations to this Court about her health in order to obtain continuances and extensions, when in reality she was actively litigating her suit against NYU and defending against legal action filed in Nevada, where her former attorney, Mr. Hafter, had sued for unpaid legal bills.

## II.  DISCUSSION

### A.  Legal Standard

Federal Rule of Civil Procedure 56(a) provides that a "court shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986) (construing the similarly worded Rule 56(c), predecessor to the current summary judgment standard set forth in Rule 56(a)).  A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, a district court "must view the evidence 'in the light most favorable to the opposing party.'"  Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  It may not make credibility determinations or engage in any weighing of the evidence.  Anderson, 477 U.S. at 255.

The showing required to establish that there is no genuine issue of material fact depends on whether the moving party bears the burden of proof at trial.  On claims for which the moving party, here the JCMC Defendants, does not bear the burden of proof at trial, the movant must point out to the district court "that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.  The JCMC Defendants, however, also raise an argument for summary judgment based on collateral estoppel, a ground on which they bear the burden of proof.  "When the moving party has the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact: it must show that, on all the

essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party."  In re Bressman, 327 F.3d 229, 238 (3d Cir. 2003) (quoting United States v. Four Parcels of Real Property, 941 F.2d 1428, 1438 (11th Cir. 1991)).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish the existence of a genuine issue as to a material fact.  Jersey Cent. Power & Light Co. v. Lacey Twp., 772 F.2d 1103, 1109 (3d Cir. 1985).  "A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."  Gleason v. Norwest Mortg., Inc., 243 F.3d 130, 138 (3d Cir. 2001), overruled on other grounds by Ray Haluch Gravel Co. v. Cent. Pension Fund of the Int'l Union of Operating Eng'rs and Participating Emp'rs, 134 S. Ct. 773 (2014).  However, the party opposing the motion for summary judgment cannot rest on mere allegations; instead, it must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson, 477 U.S. at 248; see also Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990) (holding that "unsupported allegations in [a] memorandum and pleadings are insufficient to repel summary judgment").

**B.  Collateral Estoppel**

The JCMC Defendants argue that the doctrine of collateral estoppel, also known as issue preclusion, bars Dr. Pal from bringing claims which challenge the denial of her application for privileges and the mandatory reporting of that adverse action to the National Practitioner Database.  They assert that the record of the credentialing and intra-hospital review process contains ample evidence demonstrating that Dr. Pal did not qualify for membership to the JCMC medical staff.  They further assert that Dr. Pal had a meaningful opportunity to present evidence to the contrary and indeed availed herself of the opportunity to challenge the decision to deny her application, but did not prevail.  Dr. Pal's claims, the JCMC Defendants maintain, all hinge on

the contention that the hospital's decision was wrong and thus amount to an attempt by Dr. Pal to "re-litigate" matters addressed during the intra-hospital review process.  Relying primarily on the New Jersey Appellate Division's decision in Zoneraich v. Overlook Hospital, the JCMC Defendants argue that the quasi-judicial nature of the intra-hospital procedures which resulted in the final decision of the JCMC Board of Trustees to deny Dr. Pal's application entitles the decision to preclusive effect.  See Zoneraich v. Overlook Hospital, 212 N.J. Super. 83 (App. Div.), certif. denied, 107 N.J. 32 (1986).

The Zoneraich court recognized that "hospital decisions regarding admission to medical staff, extent of privileges and termination" are not completely beyond judicial review but stressed that such review is "very limited."  Id. at 90.  It noted that the New Jersey Supreme Court has held that "so long as hospital decisions concerning medical staff are reasonable, are consistent with the public interest, and further the health care mission of the hospital, the courts will not interfere."  Id. (citing Desai v. St. Barnabas Med. Ctr., 103 N.J. 79, 91-92 (1986)).  With few exceptions, the judicial framework for review established by the state's highest court leaves a hospital's decision undisturbed so long as the procedures have been "fundamentally fair" and the record contains "sufficient reliable evidence" to justify the result.  Id. (citing Guerrero v. Burlington County Mem. Hospital, 70 N.J. 344 (1976) and Garrow v. Elizabeth General Hospital and Dispensary, 79 N.J. 549, 565 (1979)).  Against this backdrop, the Appellate Division in Zoneraich held that once a court affirms a hospital's decision regarding such staffing matters, the hospital's decision is entitled to preclusive effect and will estop a plaintiff from pursuing claims whose viability depends on a finding that the hospital decision was unlawful, wrong or otherwise improper.  Id. at 93.

13

Implicit, then, in the JCMC Defendants' collateral estoppel argument based on Zoneraich

is a request that this Court review the JCMC proceedings relating to Dr. Pal's denial of privileges

according to the deferential standard articulated by the New Jersey Supreme Court in Guerrero

and its progeny. The Court, however, declines to engage in this review.  Because, as the Opinion

will discuss below, the JCMC Defendants establish they are entitled to summary judgment on

other grounds, it is not necessary to the outcome of this motion to reach the question of whether

issue preclusion applies.

### C.  HCQIA Immunity

The HCQIA grants "limited immunity from suits from money damages to participants in

professional peer review actions."  Matthews v. Lancaster Gen. Hospital, 87 F.3d 624, 632 (3d

Cir. 1996) (citing 42 U.S.C. §§ 11101(5) & 11111(a)).  With the express exception of civil rights

claims, the statute provides that immunity from all federal and state claims for damages will

attach "if a professional review action (as defined in section 11115(9) of this title) of a

professional review body meets all the standards specified in section 11112(a) of this title." 42

U.S.C. § 11111(a).  The definition of "professional review action" is as follows:

> The term "professional review action" means an action or
> recommendation of a professional review body which is taken or made in
> the conduct of professional review activity, which is based on the
> competence or professional conduct of an individual physician (which
> conduct affects or could affect adversely the health or welfare of a patient
> or patients), and which affects (or may affect) adversely the clinical
> privileges, or membership in a professional society, of the physician. Such
> term includes a formal decision of a professional review body not to take
> an action or make a recommendation described in the previous sentence
> and also includes professional review activities relating to a professional
> review action.

42 U.S.C. § 11151(9).  In relevant part, a "professional review activity" is a term specifically

directed to an activity to determine whether an individual physician may have clinical privileges

with respect to, or membership in, a health care entity, to set the scope or conditions of privileges

or membership and/or to modify such privileges or membership.  42 U.S.C. § 11151(10).

Clearly, the recommendations made by Dr. Holmes and other members of JCMC's medical staff

and credentialing committees with regard to Dr. Pal's application for privileges, as well as the

actions taken by the Board of Trustees to deny the application and report that adverse action to

the National Practitioner Database, fall squarely within the scope of a "professional review

action."  Thus, the first criterion for HCQIA immunity to attach is met in this action.

　　　　The second criterion of immunity requires the professional review action to meet the

basic fairness standards set forth in 42 U.S.C. § 11112(a).  That provision states as follows:

> For purposes of the protection set forth in section 11111(a) of this title, a
> professional review action must be taken—
>
> (1) in the reasonable belief that the action was in the furtherance of quality
>     health care,
>
> (2) after a reasonable effort to obtain the facts of the matter,
>
> (3) after adequate notice and hearing procedures are afforded to the
>     physician involved or after such other procedures as are fair to the
>     physician under the circumstances, and
>
> (4) in the reasonable belief that the action was warranted by the facts
>     known after such reasonable effort to obtain facts and after meeting the
>     requirement of paragraph (3).

42 U.S.C. § 11112(a).  Importantly, the HCQIA presumes that a professional review action

meets the above-mentioned standards.  Id.  Section 11112(a) places the burden on a plaintiff to

rebut this presumption by a preponderance of the evidence.  Id.; see also Parmintuan v.

Nanticoke Mem. Hospital, 192 F.3d 378, 388 (3d Cir. 1999) (holding same).  Indeed, the Third

Circuit has held that the HCQIA's presumption "alters the summary judgment burden," placing

upon the non-movant the burden of demonstrating that a reasonable fact finder could find, by a

preponderance of the evidence, that the health care provider defendant, or other participant in the professional review activity, did not meet the requirements of § 11112(a) and had acted unreasonably.  Parmintuan, 192 F.3d at 388.

The Third Circuit's analysis of the immunity provision in Parmintuan is instructive.  In that case, the physician plaintiff sued the hospital that had suspended her privileges, claiming that this action was racially motivated.  Id. at 380.  The hospital prevailed on summary judgment as to all of the plaintiff's claims, including a claim of disparate treatment under 42 U.S.C. § 1981 and various state law theories of relief.  Id.  Of relevance to this Court's analysis of the JCMC Defendants' invocation of the HCQIA immunity provision, the district court in Parmintuan held that the hospital was immune from the physician's state law claims for damages by operation of the HCQIA, and the Third Circuit affirmed.  The Court of Appeals found that the plaintiff's allegations of racial discrimination failed to rebut the presumption of immunity, reasoning that the subjective motivations of the participants in the professional review activity are irrelevant to the standard that must be met for immunity to attach.  Id. at 389.  Rather, the Parmintuan court held, the participants' actions must be judged according to an objective test.  Id.  With regard to their "reasonable belief" that their actions would further quality health care and were warranted by the facts available to them, the Court held as follows:

> The "reasonable belief" standard is satisfied "if the reviewers, with the information available to them at the time of the professional review action, would reasonably have concluded that their actions would restrict incompetent behavior or would protect patients . . . under the first prong, [plaintiff] Dr. Parmintuan must show that the totality of the information available to the [defendant] Nanticoke Memorial reviewers did not provide a basis for a reasonable belief that their actions would further quality health care.

Id. (quoting Brader v. Allegheny Gen. Hosp., 167 F.3d 832, 840 (3d Cir. 1999)); see also Matthews, 87 F.3d at 635 (holding that the Third Circuit joins the other courts of appeals which

16

"have uniformly applied an objective standard in assessing compliance with § 11112(a)" and thus rejecting the plaintiff's arguments about the defendant's motivations as immaterial). The Parmintuan court further held that, to the extent the plaintiff protested that the hospital's fact gathering process was lacking, she also failed to rebut the presumption that its effort had been reasonable. The court was unpersuaded by her argument that the reviewers had refused to consider the records of other hospital physicians practicing the plaintiff's specialty because "the focus of our inquiry under the HCQIA is not whether Dr. Parmintuan was or was not a substandard doctor in comparison to other OB/GYNs at Nanticoke Memorial, but whether Nanticoke Memorial's disciplinary actions were justified after a reasonable effort to obtain the facts of the matter." Id.

Dr. Pal's effort to rebut the presumption of reasonableness given to JCMC's activity with regard to her application for surgical privileges and membership to the hospital's medical staff consists primarily of her argument that the entire process was tainted by Dr. Holmes's reliance on negative information about Dr. Pal he knew to be rooted, she maintains, in the discriminatory motive of the UMDNJ doctors who gave those references.  Even if the subjective motive of the reviewers of Dr. Pal's application were relevant to the analysis of JCMC's compliance with the basic fairness and reasonableness standards of the HCQIA – and the Third Circuit's opinion in Parmintuan clearly holds that it is not – Dr. Pal has proffered no evidence even suggesting that either Dr. Holmes or any other participant in JCMC's consideration of her application bore any improper animus towards Dr. Pal on the basis of her national origin or gender.  Nor has she proffered evidence demonstrating that it was unreasonable for Dr. Holmes to consider the negative references given by Drs. Wilson and Scholz, respectively her former supervisors in general surgery and cardiothoracic surgery residency programs.  It is uncontroverted that Dr.

Holmes was, at the time of Dr. Pal's JCMC application process, aware of the circumstances of her resignation from the UMDNJ cardiothoracic surgery residency, that is, her refusal to retract complaints of discrimination by other staff members. This knowledge, in and of itself, and in light of the totality of information gathered by Dr. Holmes in his investigation of Dr. Pal's application, does not indicate that Dr. Holmes or any of the JCMC Defendants acted improperly with regard to the application. It simply does not rebut the presumption that the denial of her application for privileges and related reporting to the National Practitioner Database were actions taken in the reasonable belief that they were in furtherance of quality health care and warranted by the facts known.[5]

Dr. Pal also criticizes the manner in which Dr. Holmes gathered information about her in the process of reviewing her application, an argument which goes to the second prong of the § 11112(a) standard, a "reasonable effort to obtain the facts of the matter." In particular, she points to the fact that Dr. Holmes contacted people not identified by Dr. Pal as references, namely Drs. Scholz, Ren and Brolin, who each provided negative references. She also complains that Dr. Holmes disregarded the "excellent" references in her file given by Drs. Deitch and Wilson, citing to exhibits showing the JCMC questionnaires completed by these individuals. Neither of these arguments rebut the presumption that the factfinding effort was reasonable. As to Dr. Holmes's request for information from non-references, this conduct if anything belies Dr. Pal's contention that his efforts were unreasonable or lacking. Drs. Scholz, Ren and Brolin were program directors of residency programs that Dr. Pal herself listed as past experience on her

---

[5] Insofar as Dr. Pal contends that Dr. Holmes's consideration of the negative references offered by Drs. Wilson and Scholz constitute a discriminatory act in violation of her civil rights, such a claim would not be subject to HCQIA immunity. See 42 U.S.C. § 11112(a). Indeed, Dr. Pal asserts a civil rights claim under 42 U.S.C. § 1985 against Dr. Holmes, and the JCMC Defendants have acknowledged that they do not seek summary judgment on the § 1985 claim based on HCQIA immunity, but rather on the merits of the claim. The Court will address Dr. Pal's § 1985 claim in the following section of the Opinion.

JCMC application, and Dr. Holmes's affirmative contact with these individuals, that is, without prior clearance for such action from Dr. Pal, reflects a diligent and comprehensive investigation in connection with her application for privileges.  Moreover, no evidence indicates that the JCMC Defendants' consideration of all the evidence available to them unreasonably discounted positive reviews about Dr. Pal.  In fact, although they were favorable, the questionnaire forms submitted by Drs. Wilson and Deitch did not rate Dr. Pal as "excellent," and Dr. Wilson later retracted his recommendation.  The evidence before this Court does not overcome the presumption that the JCMC Defendants undertook reasonable efforts to obtain the facts of the matter. [6]

Considering the totality of the circumstances of the professional review activity in an objective manner, this Court concludes that the presumption should not be disturbed.  Dr. Pal's application was considered after extensive investigation into her experience as a physician in various residency programs.  She was advised that her application was weak and given multiple opportunities to strengthen it with better references or to withdraw it.  After she pressed forward, it was reviewed by several evaluators, including not only Dr. Holmes but the JCMC Credentials Committee and the Medical Executive Committee.  The initial denial occurred after a lengthy phase of investigation and review taking place over several months before many reviewers. She was then afforded the opportunity to challenge the decision, and it was affirmed after a two-day hearing at which Dr. Pal testified and participated with the assistance of counsel.  Post-hearing written submissions were accepted and considered.  Dr. Pal availed herself of the further

---

[6] Dr. Pal also asserts in her papers that she was prevented from presenting evidence in her favor at the Fair Hearing. This assertion is baseless.  Her citations to the transcript of the hearing session of October 11, 2010, which purportedly demonstrate instances in which her evidence was rejected, actually demonstrate the hearing panel's management of the presentation of evidence on the basis of relevance to the proceedings.  For example, Dr. Pal asserts that the panel chairman instructed the panel not to consider certain testimony by Dr. Pal, but the transcript reflects that he was explaining that if an objection to a question is raised and the witness proceeds to answer the question before the objection is sustained, the panel must disregard the testimony.  (See 10/11/10 Tr. at 22:15-24.)

opportunity to appeal.  The record shows that her application for privileges at JCMC was denied based on the overall lack of support from references and former supervisors, in particular as the information related to her ability to interact with others professionally, a quality a hospital may objectively value in a surgeon as having an impact on the delivery of patient care.

In effect, Dr. Pal argues that the JCMC Defendants were somehow required to ignore negative references and references which were at best lukewarm, in favor of those that supported her.  The HCQIA does not require such an approach to matters regarding a physician's privileges or hospital staff membership, and this Court has no authority to second-guess the JCMC Defendants' review and consideration of her application.  In light of the HCQIA's statutory presumption, it is Dr. Pal who bears the initial burden on this motion to demonstrate the existence of a genuine issue of fact as to the whether the JCMC credentialing process met the standards of § 11112(a).  In other words, because the HCQIA places the burden on the plaintiff to demonstrate that the statutory presumption does not apply, Dr. Pal can overcome the JCMC Defendants' motion for summary judgment based on HCQIA immunity only if she demonstrates that a reasonable jury could find, by a preponderance of the evidence, that the standards were not met.  She has not done so.

Plaintiff's claims for breach of contract and defamation arise from activity in connection with her application for privileges at JCMC and appointment to the hospital's medical staff. Because the denial of her application constitutes a professional review action under the HCQIA and because Dr. Pal has failed to rebut the presumption of § 11112(a), summary judgment on these claims is warranted on the basis of immunity under 42 U.S.C. § 11111.

**D.  Conspiracy to Violate Civil Rights**

Plaintiff asserts a claim under 42 U.S.C. § 1985(3) against Dr. Holmes for his alleged participation in a conspiracy with Drs. Wilson and Scholz to deprive her of her "expected recommendations" and thus her opportunity to practice general surgery based on Dr. Pal's gender and/or national origin.  Section 1985(3) authorizes a private cause of action against the participants in conspiracies formed "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws[.]"  42 U.S.C. § 1985(3); Griffin v. Breckenridge, 403 U.S. 88, 102-03 (1971).  The statute does not create any substantive rights, but permits individuals to enforce substantive rights against conspiring private parties."  Farber v. City of Paterson, 440 F.3d 131, 134 (2006).  To obtain relief under § 1985(3), a plaintiff must prove the following elements: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States." United Bhd. of Carpenters & Joiners v. Scott, 463 U.S. 825, 828-29 (1983) (citing Griffin, 403 U.S. at 102-03). A conspiracy requires agreement and concerted action. Capogrosso v. Sup. Ct. of N.J., 588 F.3d 180, 184 (3d Cir. 2009).

According to Dr. Pal, an invidiously motivated conspiracy against her is evidenced by the communications Dr. Holmes initiated with Drs. Wilson and Scholz to gather information in connection with her application for privileges at JCMC.  She asserts that it is undisputed that Dr. Wilson initially gave a favorable reference and that he later retracted it when he spoke with Dr. Holmes in light of his further review of Dr. Pal's file.  It is further undisputed, she argues, that

21

Dr. Holmes knew that Dr. Pal had made complaints about discrimination while at UMDNJ-RWJ and that she was constructively terminated as a result of this conduct.  She points out that the record demonstrates that Dr. Holmes in fact admits he was aware of this situation and that the incident was a subject of his discussion with Dr. Scholz during their conversation related to Dr. Pal's JCMC application.  She asserts that her application was denied as a result of this discriminatory conspiracy.  According to Dr. Pal, Dr. Holmes expressly informed her that "the reason he was recommending a denial of privileges was because Pal had made a complaint against the race and gender discrimination and retaliation against UMDNJ-RWJM."  (Opp. Br. at 11.)  The proof of this fact, she argues, is found in an August 7, 2009 email *Dr. Pal* wrote to Dr. Holmes, purportedly confirming that Dr. Holmes had explained to her that he could not recommend her application be approved because she had objected to "racially derogatory comments" during her residency program.

The JCMC Defendants argue that there is no evidence in the record that Dr. Holmes was motivated by any illegal animus to recommend that Dr. Pal's application for privileges by denied, that is, that he sought to deprive her of a position on the JCMC medical staff on the basis of her gender or national origin.  They further point out that the record is devoid of evidence of any conspiracy between Dr. Holmes and Dr. Wilson and/or Dr. Holmes and Dr. Scholz.  Defendants are correct.  Plaintiff points to no evidence indicating that Dr. Holmes acted in concert with the UMDNJ doctors to deny her application for a discriminatory purpose.  Dr. Holmes indisputably spoke with Dr. Wilson and Dr. Scholz in the investigation relating to Dr. Pal's application, but Dr. Pal points to no facts from which a reasonable factfinder could infer that the mere receipt by Dr. Holmes of negative information about an applicant constitutes a conspiracy.  Moreover, a crucial part of Dr. Pal's § 1985 claim against Dr. Holmes, is the

discriminatory animus with which she maintains Drs. Wilson and Scholz acted in providing the negative references to Dr. Holmes, but this premise is cast into doubt, if not directly contradicted by the verdict obtained by Dr. Pal in the State Action.  As this Court noted in its July 21, 2014 Opinion, Dr. Pal actually litigated in the State Action the issue of whether the negative references given by Drs. Wilson and Scholz constituted discriminatory retaliation, and the jury expressly found that they did not.  Even assuming that the providers of the information bore a discriminatory animus, there is no evidence that Dr. Holmes was motivated to act against Dr. Pal based on her gender or national origin or based the complaints she made while at UMDNJ-RWJ. The only proof Dr. Pal proffers of Dr. Holmes's purported discriminatory animus is the August 7, 2009 email authored by Dr. Pal herself, in which she asserts that her complaints of discrimination at UMDNJ-RWJ motivated Dr. Holmes to recommend that her application for a position at JCMC be denied.  Contrary to Dr. Pal's self-serving assertion, the record contains an overwhelming amount of evidence that Dr. Pal's application for privileges was not adequately supported by favorable references and that Dr. Holmes recommended the application be denied in view of the lack of support by doctors who had previously worked with or supervised Dr. Pal.

For these reasons, JCMC Defendants have demonstrated no genuine issue of fact as to Plaintiff's § 1985 claim.  The record lacks evidence to satisfy the elements of this claim, and accordingly, summary judgment in favor of the JCMC Defendants will be granted.

**III.    CONCLUSION**

For the foregoing reasons, the Court finds that Plaintiff's state law claims against the

JCMC Defendants are barred by the immunity conferred by the HCQIA, 42 U.S.C. § 11111.  Her

claim under 42 U.S.C. § 1985(3) cannot prevail as a matter of law.  The motion for summary

judgment filed by the JCMC Defendants will accordingly be granted in its entirety.  An

appropriate Order will be filed.


                                              _____s/ Stanley R. Chesler_____
                                              STANLEY R. CHESLER
                                            United States District Judge

Dated:  October 24, 2014